May it please the Court, Michael Conger and Richard H. Bennis are here for Appellate Allison Terry. I'd like to reserve a little time for rebuttal. As Judge Paez wrote in the Guinness v. GTE Service Corporation, quote, when a court too readily grants summary judgment, it runs the risk of providing a protective shield for discriminatory behavior that our society has determined must be extirpated. Summary judgment in this case is shielding behavior which led to a workforce in which virtually all higher paying management positions are held by men. At page four of our opening brief, we provided the Court with a graphic demonstration of what the lifeguard workforce looks like, male and female. Summary judgment is precluding any inquiry of the reasons for this gender skewed workforce in the crucible of trial. This morning I'd like to address three points. One, Ms. Terry's disparate impact theory. Two, her disparate treatment theory. And third, her retaliation claim. What you really need to show us are that there are material issues of fact. Yes, Your Honor. And we believe that essentially what the main problem was is the Court weighed the evidence. In fact, in his order he even used the word he was persuaded by. But the issue is, and that's not the function of a trial court, particularly in a summary judgment case, as Your Honor, Judge Fletcher has written on many occasions. In a discrimination summary judgment case, it's even more important that you have the full trial so you can weigh this evidence. Ms. Terry presented sufficient evidence. We looked at it in the light most favorable to her, particularly in the disparate treatment arena, that men were treated more favorably, which I'll get to in a minute. But that's really the crux of the disparate treatment case here. But on disparate impact, where I think there's some very important issues for this Court, is there's really two major points. One is the procedural due process aspect raised by her appeal, where in the city's opening brief at summary judgment, it didn't even address that theory, even though it was aware of it, having previously filed a motion in limine and deposed Ms. Terry's statistician, the only statistician in the case. And the city certainly in its opening brief never raised the issue of the appropriate comparison pool or the proxy comparison pool or the qualification issue, which the Court latched on to when it, for the first time in its order, cited the Moore versus the Moore case. So the second major issue is that there's really two parts of her disparate impact case, and one is being overlooked here. And that is that Ms. Terry is challenging the city's use of the employee performance rating, the used in the promotional decision-making process, that males shouldn't have any higher advantage than females because they're rated on things like punctuality, courtesy, and good communication skills. They're not rated on strength and anything that God would favor a man over a woman. And third is that, in fact, men have an incredible, an astounding advantage over women. We've shown that statistically in getting the best performance rating, which increases their chance of promotion. So her disparate impact theory, first and foremost, seeks to have the Court say you can't use that in your promotional decisions, period. Counsel, she was in this so-called lifeguard one category? Yes, sir. I guess she still is. She still is. She actually has now resigned from the lifeguard service. Oh. And, Your Honor, lifeguard ones, just so we're all clear, if it wasn't clear in the record, lifeguard ones are the city uses, there's about 200 of them, there's seasonal lifeguards that work from Memorial Day to Labor Day, when the beaches are more crowded, and then everyone else from the lifeguard two rank up is a permanent employee, full-time, full year-round, earning pension and much higher pay. Lifeguard ones typically earn... So she's only seeking damages. She's not seeking any type of relief because she's not there anymore. She's not there anymore, but she, of course, the complaint speaks at the time of filing, and she's seeking injunctive relief to prevent the city from using this EPR process. But she's not there anymore, so does she have standing for that? She has, I believe standing is going to be, that wasn't raised below, but I believe standing would be as of the time the complaint was filed. It's because of that time. All right. Well, we'll have to look at that. But in any event, so all promotions to this lifeguard two position come from applicants or from people who are actually lifeguard ones, and they don't go outside. Absolutely. They don't go up to Los Angeles and say, well, who's our best lifeguard up here? Come down and be a lifeguard two. It all has to be. So isn't, to some degree at least, a function of how many female applicants you get for lifeguard one going to determine how many females you get for lifeguard two? It could be that way. Sure, it could be that way. But here there was evidence why it isn't that way, why women don't apply for that job, and that's what I'm getting to next. But you're right. When there's evidence of deselection, it's the phenomenon that the Supreme Court addressed, I believe, in international teamsters, the whites only policy. When you put a whites only sign above the hiring door, it discourages black applicants. And so you can't use the actual applicant pool because it would skew the results. You should use a proxy comparison pool. Again, that wasn't raised in the opening papers. We didn't get into this. When Ms. Terry filed a supplemental brief on this point, because it was raised by the city for the first time in its reply brief, the court refused to consider it. She hasn't had due process on this point. I have zero problem addressing it. We're prepared to address it, but we just want a fair process, particularly in a discrimination case, particularly where we're trying to explain why this chart looks like this. This is what this case is about. And so the second part of her disparate treatment case, so part one says you can't use the EPR. It's unfair. It's like a testing case, like Bowman versus Block. That test, you've got to throw it out. It can't be used. So on that claim, what are the facts in dispute that merit a trial? There are no facts in dispute on that claim. I believe the plaintiff would be entitled to summary judgment on that claim, on that part of her claim. We have all the, and here's another error that the district court made, is that he thought we only presented evidence of the ratings from 99 to 03, but we have it in the record, of course, where the city changed the top rating from outstanding to commendation. And that evidence is in there in the record also for 2004 and 2005. They just changed the name for the best rating. But Judge Ezra, so to answer your question specifically, when you have a discrimination of disparate impact case, there's a great body of law when it's a promotion case, typically you would use the actual applicant pool, unless there's evidence of deselection, where the protected class might not apply to whites-only phenomenon. And here was the evidence that we presented, even though it was almost coincidentally in the record. One is that we have declarations from female lifeguard ones who said they were told if you don't have the best rating, it would be a waste of time to apply. Uncontroverted evidence. That's going to discourage applicants. And just think what we're talking about here practically. A female's not going to know what everybody, these aren't publicized ratings. You know what you got. I got an average. We used to call them standard, above standard, and outstanding. Or I didn't get a commendation. I don't know what everybody else got. I certainly don't know the statistics of men and women. I don't know that. I just know that I probably shouldn't apply because they said it would be a waste of time. You're talking about applying for lifeguard two or applying for lifeguard one? Applying for lifeguard two. My question is, though, if you're looking at the small number of lifeguard two successful applicants and the percentage of men in that pool versus women, you would necessarily have to go back and see how many women were in fact in lifeguard one and whether it was proportional there. My question is, if you're going to apply for lifeguard two, you would need to see how many women's lives got saved in lifeguard two. My question is, if you're going to apply for lifeguard two, you would need to see how many women's lives got saved in lifeguard two. She didn't get selected, but somebody got selected. A female did get promoted. Well, yeah, there was a male that got selected. And he got disqualified because of some discrepancy in his employment history or Didn't pass his background check. Yeah, okay. But then the person who actually got the job was a woman. That's correct. And, Your Honor, we don't have to prove perfect discrimination. I don't have to prove that a woman never got promoted. What we're trying to establish is that there's discriminatory impact problems. And in her particular case, men were treated more favorably, which I'll get to as quickly as I can. Well, what I'm trying to figure out is whether your argument is that women didn't apply for the lifeguard one position because they were aware they would never get promoted, or whether the, if your argument is, and what you presented to the court was, the percentage of women in lifeguard one versus the percentage that got promoted to lifeguard two showed disparate treatment. Really both. So let me explain. What I'm saying is that the proper comparison pool, which is called the proxy comparison pool, shouldn't be the actual applicant pool because there's four different pieces of evidence of deselection. I've mentioned one. So you then have a question, and this is what Moore talks about, which was in the address below because nobody raised it. Moore case says, okay, do you use general population statistics? Women are 51% of the general population. Or do you use a narrower proxy comparison pool of the lifeguard one workforce because, as Tidyman said, that's where all the hiring comes from, 100% of it. And our statistician, again, on contrary, used the middle one, which is about 25% lifeguard ones, female, as the appropriate comparison pool because of the evidence of deselection. If you don't recognize that there's evidence of deselection, then you're going to shield discriminatory practices, which Judge Pius wrote about it. But that's where the district court disagreed with you. That is exactly where the district court disagreed with us on an issue not raised by the city until its reply brief, and then you wouldn't consider our supplemental brief, and that's where we think there's a due process problem. But the additional evidence of deselection in the record is more than just what women were told, don't bother applying. We have evidence of difficulty in obtaining the minimum qualifications that are different from lifeguard one to lifeguard two. Let me have you talk a little bit about the treatment of this particular plaintiff. Absolutely. I know your time's almost up, and we've used it, but... Thank you, Judge Fleisher. Let me move to disparate treatment. So it's a proxy comparison pool, Judge Ezra. On disparate treatment, the real only issue, there's four elements, as the court well knows. There's protected class, qualification, adverse employment action, and similarly situated males are treated more favorably. The city, remember, the city, the judge even said that the city concedes made a prima facie case, and this is where the court stepped out of its impartial adjudicator role. When it didn't even say, Ms. Terry, I'm looking at the prima facie case even though the city conceded it, but the city's only contesting really the fourth one, that males are treated more favorably, because they say she was highly qualified. Number two was there, and she's certainly in a protected class, and certainly had adverse employment action. There's three ways that she was treated less favorably than men. The most important of which, I think, and the most egregious, is that she has evidence, again, in light most favorable to her, she was told what was weighted most heavily against her in a very close hiring panel, and the difference was subtle. These are all quotes in the record, and what separated her from the others was not to have certain classes she was never told about, PCA 32, which is a law enforcement class, and Swift Water Rescue 1 and 2, which are training classes for making Swift Water Rescues. Well, I thought, wasn't there also a situation where she was aware of something, but it only happened at certain beaches, and they wouldn't assign her to those beaches? No, sir, I don't believe that's in the record. On this issue, she put it in her declaration, she was never told about these courses until she had the post, she didn't get the job explanation. I thought there was something about her not getting... That was about difficulty in obtaining her personal watercraft certification. Okay, that's where that is, all right. So, Judge Fletcher, back to you. There's three ways that men were treated more favorably in this record. One, we've showed that some men, again, the women, were told, and never women, that take these classes, it's going to get you up, it's going to give you, in a close call, this is going to give you the leg up. Why would they do that? Why would an employer, we have evidence that in 2003 they used PCA 32, Swift Water Tech 1 and 2. Why would an employer legitimately not publicize criteria they're going to use and only tell some of the applicants, much less always only male applicants? Why would they do that, unless you're trying to discriminate? The second way, in the EPR process itself. So the EPR process is really part of both theories, impact and treatment. We have shown and the statistician has commented on the statistical significance of men that get the promotion typically have two or three outstanding ratings, typically three. And there's a correlation between getting the best rating and getting the job. And Ms. Terry didn't. She had two best and one lowest. She didn't get the job. Men are treated more favorably. So that's evidence that men are treated more favorably, third element of her prima facie case. And the PWC certification process, Judge Fletcher. Again, she put in evidence that she was treated less favorably than men. She was told she needed two, happened to be male, approvals for her to take the test. They wouldn't even let her be tested until she got the recommendations for testing. There's four of these waive runners in the entire life card service. But you have to have this certification in order to be able to even apply for the promotion. You've used up your time, unfortunately. Thank you, Your Honor. I'll reserve whatever I have left. There is money. Thank you. Good morning, Your Honors. Joe Cordelioni appearing on behalf of the City of San Diego. What I'd like to address first is the flaw of plaintiffs' disparate impact theory. The question that we ask on disparate impact is, is there something going on that appears facially neutral that causes women not to apply for promotion? If that is the question, then Alice and Terry is not the person who is permitted to ask it. It's not her issue. She has never presented any evidence of any kind at any point in time that she was discouraged because she had been told she didn't have enough high-performance evaluations or that anything was going on in her life or in her interface with the lifeguarding system that would discourage her from applying. So if the question is, is there something that appears facially neutral that's prohibiting women from applying for this position, Alice and Terry is not the claimant to ask that question. That didn't happen. She did apply. So let's ask the next question. Wait a minute. If there is a barrier to promotion for women, are you suggesting that because some woman decided she's going to try anyway, that that somehow alleviates the barrier? Not at all. Not at all. And that may be an issue, but that issue was never briefed, never raised, never addressed, and never defended by the city at any point in this lawsuit. From the moment it was filed until the moment summary judgment was granted, there had never been a claim. It came up as part of this defense of the summary judgment motion. And the city has repeatedly, there's this claim that we just raised this issue in our rebuttal. The city has repeatedly said, let's address the issue of, which is the real question raised in the complaint and in the amended complaint, the allegation is that there's something going on that appears facially neutral, but in fact causes women not to be promoted in ratios that are representative of the women who apply. And we cited Stout v. Potter long ago. We cited it in the summary judgment motion, and it was never ever challenged until the opposition papers. What Stout v. Potter says, what the rule is, what the judge relied upon, what the Moore v. Hughes helicopter case, what they all say is the same thing. If you're looking at a disparate impact theory in terms of hiring or promotion, you look at the applicant pool, and you look at the people who are actually promoted. And in fact... Not where you look if the applicants have been discouraged from applying. True, that is true, but there's never been an allegation until the opposition to the summary judgment motion. Well, we decide everything most favorably toward the non-moving party, so they can raise it in their opposition, isn't that right? And they did raise it in the opposition, but again, Allison Terry is not the person who suffered as a result of it. Every single case that the plaintiff relied upon is a case where you have something... The more I hear you this morning, it sounds just like there's a factual dispute here that needs to be tried. No factual dispute at all. And the reason it's not is everyone agrees that the applicants were promoted in perfect ratio to their gender. Assuming that's based on the applicant pool. Correct, and that's the only... I mean, the actual applicants. Right, and remember, one of the applicants was the plaintiff. So she may have... Again, she may have, and I will address the disparate treatment allegations, but in terms of disparate impact, you have 20% of the people who were promoted. were females, and they were 20% of the applicants. 60% of the individuals who were rated as highly qualified were females, whereas only 43% of the men were rated as highly qualified. So again, and only addressing disparate impact... the proportion of women in the city of San Diego population. Again, it's not her claim. She did apply, and all the women who applied were treated gender neutral. As many women were... Actually, a few more women were promoted than men by percentage. Well, there was no woman promoted until one man was disqualified. Correct. Nevertheless, when you get down to... We have a total of 15 qualified people. You can't say it's got to be statistic. We can't have quotas. The Palmer case says that, the Moore versus Hughes. So in terms of a disparate impact claim, the judge was correct. The trial court was correct. You do not depart from the norm, which is... In Moore versus Hughes helicopter case says that. You do not depart from the norm of looking at the applicant's pool unless, number one, there's something extraordinary, such as it's just, well, we want to have warm bodies. We're hiring parking lot attendants. You don't have to have any special skills to be a parking lot attendant, because the worst that will happen is it's a dented car. In this case, you have to have special skills, and so only qualified applicants may apply. But she was a qualified applicant. She was already in there. Now, did she suffer any disparate treatment, and did she produce any disputed evidence? Is there any question of fact as to whether she suffered disparate treatment? Three people testified, uncontroverted, that the reason they ranked her 14th instead of 13th, 12th, 11th, 10th, and all the other numbers you need to get up to number 6 or 7, which is hiring, had nothing to do with her sex. They didn't promote her because based on a whole... Oh, yeah, of course. It was undisputed. He weighed the evidence. Weighed it against what? There was other evidence to consider against that. Here's what we need to look at, though. Under the Bergeen case, once we demonstrate evidence of a legitimate, nondiscriminatory intent, which is what was done with the declarations of the three individuals who were in it, now the burden shifts upon the plaintiff to produce specific and substantial evidence that those reasons, as stated, are pretextual. Well, wait a minute. We're not talking about a three-person business here. This is the entire City of San Diego Lifeguard Service. If you have people in the lifeguards... She presented evidence. We have to look at the evidence in a light most favorable to her, right? Yeah. Okay. She presents evidence that somebody in the lifeguard service is tipping off men, that one of the factors is these various extra classes or certifications. Nobody's tipping off the female lifeguards as to this. So the actual panel then shows up, and they do their evaluation. And let's assume that the panel itself does its evaluation without even any understanding that this chicanery had gone on. So they're looking at her application. Oh, she doesn't have these tests, but look over here. Here's this guy. He's got all these certifications. We're going to promote him. They may not have had a discriminatory intent, but maybe somebody else did. And so then she is the benefactor of the malfactors that went into the process. How can you justify that? If that were true, I wouldn't try to justify it. I wouldn't be standing here, Your Honor, because if that were true and if there really were evidence to that effect, people would be getting fired down at the City of San Diego. But in fact, when counsel comes down here and whispers about these secrets, there's no evidence. There is no evidence. What the evidence is, the only evidence that was presented was out of 510 different performance reviews. 2% of them suggested, made by three different guards to about five different people, a total of 2% said, you, Mr. So-and-so. And incidentally, there were women also who were given that advice as part of their personal consultation with their performance review. And that's in the record? It's all in the record, absolutely. So it wasn't just men, you're saying? No, absolutely not. In fact, we demonstrate that when they make the statement to the trial court that no woman was ever told about 832, we show that, in fact, women who were taking that advice... So they said there was only women, and they have evidence of that, and you say that there were men and women who were given that advice. Then there's a dispute, isn't there? No, no, let me correct you. They made the statement that it never happened, but they had no evidence supporting that. Who made the statement what never happened? In the argument against the summary judgment motion, a misstatement of fact was made. That misstatement of fact, which is easily verifiable, is no woman was ever told about PC 832, and no woman was ever told about the swift water training or SRT. That's just an aversion. This fact doesn't exist. We then presented evidence that, in fact, women had been told about them, and we also presented evidence as to what happened. Why did that particular very narrow 2% get this advice? Let me stop you right here. When you say they made the statement, was it just a statement in their papers, or were there affidavits or other information? Just a statement in the papers. No affidavit, no documentation, nothing. It's just, I'm the lawyer, take my word for it, you can't find anything in the record. Now, did you put in affidavits? Yes, ma'am. Yes, ma'am. Yes, in fact. We did. We'll find that in the record. Absolutely. The declaration of Sergeant John Vipon, I can't give you the page, but it was very clear, and it explained that whole, this nonsense about the secret key. And, in fact, the judge at the trial noted, this secret key stuff is foolish, because if you look at who were the people who were hired, the people who were hired, there was no correlation between their having virtually no correlation, like maybe one person had both been told to take 832 and did take 832 and did get hired. Others never heard about it, and they got hired. Others were told and didn't take it, and they got hired. A woman was told to take it, and she didn't take it, and she got hired. There's no correlation. It's lawyer double talk. There are no facts to support that. And, again, they had to have specific and substantial evidence that what those three people did was pretextual and contextual. What they all said amounts to this. She's a great lifeguard. She's 14th out of 33, but her heart wasn't in it. She chose, rather than going out and saving lives and working on weekends, she chose to work on weekdays, even though you know that if you want to be a lifeguard, a permanent lifeguard instead of a seasonal lifeguard, you get in there and work on weekends. She chose to stop training on the personal watercraft because she might injure herself in her Olympic training. She chose to quit work so that she could go off and compete. She chose to revert from a part-time or from a full-time seasonal guard to an on-call, don't-make-me-work-full-time seasonal guard so that she could pursue other things. She chose to go to Turkey on some sort of goodwill ambassador mission, and bless her for that. But those choices, personal choices she made. Yes. Thank you, Your Honors. I appreciate the opportunity to speak. I'll do my best not to talk like a defender of the press. You've got one minute. Very briefly. 3 ER 573. This is what she was told, and she wrote this the same day when she had her critique. Sergeant Vipod added PCA 32. This course is weighted very heavily. I was told that separated me from the others. Performance evaluation for weight in the decision. Two things I was lacking. Technical rescue courses and law enforcement courses. Now we find out that the real reason is that her heart wasn't in it. Well, that's pretext. That's not what she was told. Counsel, if you look at the Moore case, I'll just give you the quick pinpoint. They start their analysis by going through and explaining why you don't use the applicant pool when there's evidence of deselection. There's a fundamental disconnect here because of the way this was briefed below. The issue is whether Ms. Terry applied. We're not talking about that. We're talking about for disparate impact, which applicant pool do you use, the actual one or a larger pool because of deselection? I got it. Thanks. Thank you, Your Honors. I appreciate it. I appreciate your arguments. The matter will be submitted. And our next and final case for argument is Adelie v. Sachs.
judges: Ezra, Fletcher B. , Paez